## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 04 2020, 8:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Renee M. Ortega
Lake County Juvenile
Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Myriam Serrano
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| B.C.,<br>*Appellant-Respondent,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Petitioner.* | November 4, 2020<br><br>Court of Appeals Case No.<br>20A-JV-1019<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Robert G. Vann, Magistrate<br><br>Trial Court Cause No.<br>45D06-2003-JD-132 |

**Mathias, Judge.**

[1] B.C. appeals the juvenile court's order committing him to the Indiana Department of Correction ("DOC").

[2] We affirm.

## Facts and Procedural History

[3] Over a three-month period in 2019, then sixteen-year-old B.C. received three delinquency referrals. Those referrals ultimately resulted in two adjudications, one for resisting law enforcement, and the other for dangerous possession of a firearm. As a result of the second adjudication, B.C. was placed on intensive probation level 2, which is "the absolute highest form of supervision" offered outside of secure detention. Tr. p. 8. While on intensive probation, B.C.—in his mother's home—received weekly services, including substance abuse counseling, drug testing, individual therapy, tutoring, and mentoring. Though B.C. was compliant, he showed little improvement. *See id.* at 9.

[4] Then, on February 12, 2020, B.C.'s mother found a loaded 9mm handgun under her son's bed and called the police. The responding officer secured the firearm and learned that it had been reported stolen. About a month later, the State alleged that B.C.—now seventeen years old—was delinquent for committing what would be Level 6 felony theft of a firearm if committed by an adult.

[5] At B.C.'s initial hearing, the State amended the delinquent act to Class A misdemeanor dangerous possession of a firearm if committed by an adult. B.C. admitted to the offense, and the juvenile court adjudicated him delinquent. During the hearing, three service providers expressed safety concerns with

releasing B.C. to his mother pending disposition. So, the court ordered B.C. remain detained and set a date for the dispositional hearing.

[6] After the hearing was twice continued, B.C. waived the in-person requirement and agreed to proceed by written recommendations. B.C. argued that he should be returned to his mother's home on house arrest with electronic monitoring. Both the State and the probation department recommended placement in the DOC. The State cited B.C.'s recent, prior adjudications and his pattern of escalating behavior involving firearms. B.C.'s probation officer noted, "even while on house arrest the youth was able to obtain a firearm." Appellant's App. p. 49. The officer also recommended that B.C. receive services while incarcerated.

[7] A few weeks later, "[a]fter a thorough review of the file and all recommendations," the juvenile court granted wardship of B.C. to the DOC. *Id.* at 84. The court reasoned that "remaining in the home would be contrary to the welfare of the child because the child is engaging in dangerous behaviors which jeopardize" his well-being. *Id.* at 85. The juvenile court also requested B.C. "be placed on parole supervision" to ensure that he successfully completes counseling and certain programs while incarcerated. *Id.* at 84.

[8] B.C. now appeals his placement.

# Standard or Review

[9] A court has broad discretion when choosing the specific disposition of a juvenile found to be delinquent. *M.C. v. State*, 134 N.E.3d 453, 458 (Ind. Ct.

App. 2019), *trans. denied*, *cert denied*, *sub nom. M.C. v. Indiana*, --- S. Ct. ---- (2020). In this context, that discretion is delineated by statute which, in most circumstances, requires a juvenile court to select the "most family like" placement. Ind. Code § 31-37-18-6. But placement in a more restrictive environment, like a public institution, is appropriate when it is in the best interest of both the juvenile and society. *M.C.*, 134 N.E.3d at 459.

[10] We will thus reverse a juvenile court's disposition decision only if there has been an abuse of discretion. *Id.* at 458. The court abuse its discretion if its decision is "clearly erroneous and against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual inferences that can be drawn therefrom." *Id.*

## Discussion and Decision

[11] B.C. asserts that the juvenile court abused its discretion in committing him to the DOC. In making this argument,[1] B.C. compares his circumstances to those in *E.H. v. State*, 764 N.E.2d 681 (Ind. Ct. App. 2002), *trans. denied*, where a panel of this court reversed a juvenile court's decision to grant wardship of fourteen-year-old E.H. to the DOC, *id.* at 685. But, as detailed below, that

---

[1] In a single sentence, B.C. also asserts that "with COVID-19 occurring, B.C.'s safety is at issue in being placed in location where there are large groups of people in one place." Appellant's Br. at 7–8. This argument is waived as B.C. has not provided any information or argument about either himself or his placement to demonstrate that his "safety is at issue." *See* Ind. Appellate Rule 46(8)(a). Waiver aside, we note that the DOC has instituted an extensive plan to manage the virus in each of its facilities across the state. *See IDOC Comprehensive Response to Covid-19*, https://www.in.gov/idoc/about-idoc/idoc-comprehensive-response-to-covid-19/ [https://perma.cc/6TSN-WUMU]. And B.C. makes no argument that the DOC's response is somehow inadequate.

comparison is unavailing; and we find that the juvenile court here did not abuse its discretion.

[12] In *E.H.*, this court, in reversing the juvenile court's disposition decision, highlighted four circumstances: E.H. did not have a violent criminal record; there was no evidence that he was a threat to the community; E.H. had made "considerable progress" responding to services; and his foster-care placement, where he had shown "significant improvement," was a less restrictive alternative placement. *Id.* at 685–86. None of these circumstances is present here.

[13] B.C.'s juvenile record includes several crimes related to violence that he committed over a short period of time. In less than a year, B.C. accumulated four delinquency referrals that included allegations of auto theft, resisting law enforcement, theft of a firearm, dangerous possession of a firearm, and reckless driving. Those referrals resulted in three adjudications, including the current offense—a second true finding for Class A misdemeanor dangerous possession of a firearm if committed by an adult.

[14] Aside from B.C.'s concerning criminal behavior, the juvenile court was also presented with evidence demonstrating that B.C. was a threat to the community. One of his counselors explained that, after weekly therapy sessions for nearly seven months, B.C. "still minimizes his behaviors." Tr. p. 9. His probation officer expressed the same concern. Appellant's App. p. 50. And their characterization is supported by B.C.'s conduct since he became involved with

the juvenile justice system. For example, the night after B.C. was released from a juvenile correctional facility, he was arrested for carrying a firearm. It was not even nine months later that his mother—with B.C. on the highest form of supervision outside of secure detention—found a stolen, loaded 9mm handgun under her son's bed. And though B.C. said that he needed the gun for protection from a particular individual, B.C.'s text messages show that he escalated the conflict to the point of telling the person "that he would be coming to his street within 10 minutes." *Id.* at 43. It is not surprising that B.C.'s probation officer described him as "almost flippant in his attitude over the entire situation." *Id.*

[15] The record further reveals that B.C. has made little progress responding to services. One of the providers noted that he "continue[d] to be a little disheartened that despite the opportunities [B.C.'s] been given" he still "make[s] these bad decisions." Tr. p. 10. Indeed, though B.C. received weekly drug tests, he told his probation officer that he smokes marijuana " at least five times a day." Appellant's App. p. 48. In addition to failing fourteen of nineteen drug tests, B.C. also "attempted to falsify" two of the screens. *Id.* And, as noted above, B.C.'s counselor expressed dismay that, during sessions, he continues to minimize his actions. As B.C.'s probation officer expressed, after seven months of services, the providers "are not seeing any type of definable change." Tr. p. 8.

[16] Finally, the record fails to reveal a viable least restrictive placement. B.C. argued to be returned to his mother's home, but two service providers expressed safety concerns with that placement, where "there is a lack of supervision and

consistency." *Id.* at 10. Indeed, B.C. was under his mother's supervision when he obtained the stolen firearm. And though his probation officer contacted three placement facilities, each declined to accept B.C., with one location citing "the seriousness of the child's charges" and his resistance "to treatment services." Appellant's App. p. 50.

[17] In sum, the record supports the juvenile court's conclusion that a more restrictive placement for B.C. was in the best interest of both himself and society. *See M.C.*, 134 N.E.3d at 459. Thus, the court did not abuse its discretion in committing B.C. to the DOC.

[18] We make one final observation. In reviewing B.C.'s case file, we learned that he is likely to be released from the DOC before this decision is issued.[2] We remind B.C. of a July 2019 interview in which he told a psychologist that, if given three wishes, one would be to "start over." Appellant's App. p. 77. He now has that opportunity. And we sincerely hope that B.C.—now an adult—has learned from his past, avoids compromising situations going forward, and ultimately chooses to be a law-abiding citizen.

## Conclusion

[19] The juvenile court's decision to place B.C. in the DOC was not an abuse of discretion.

---

[2] B.C. is scheduled to be released from DOC custody on November 16, 2020.

Affirmed.

Bradford, C.J., and Najam, J., concur.